Mr. Sandage, first of all, thank you for your service on the Criminal Justice Act. We certainly always appreciate that. We appreciate it too, Judge, and I want to thank my co-counsel Kent Gibson. He's a learned counsel on this 2254 before the court. I've had trial experience. And the appreciation goes to both of you, so we thank you both. Sure. I'm trial counsel in some capital cases in the Federal District, Western District of Missouri, but this is my first post-conviction 2254. It may please the court. One thing is perfectly clear from the record. Earl Forrest is brain damaged. He's been brain damaged. And defense counsel, trial counsel, learned of that sometime in probably May 2003. As the record suggests, in May 2003, trial counsel had a team meeting and one of trial needed to look into retaining several experts. All of those experts looked into whether or not Earl Forrest was brain damaged, including that expert was Dr. Preston from here in Kansas City, Missouri. What happens afterwards is that for reasons unknown, trial counsel abandons looking at Dr. Preston or anybody else who'd do objective scientific PET scans or otherwise into Earl Forrest's brain damage. As a result of that, we believe that error occurred, that Mr. Forrest was prejudiced, and the jury, we have no confidence in the jury's verdict as it relates to the penalty phase decision. We believe that Strickland was violated here and that Mr. Forrest deserves relief. When we look at the standard of review, we move that this court consider de novo review on two different reasons. One, that under 2254D1, that the trial court or the Missouri Supreme Court and the trial court below, District Court below Judge Smith, did not properly look at Wiggins, thus in violation of Strickland. When it parsed out each of the different mitigating factors that we believe were left out of the record that underlying trial counsel was deficient We also believe that there was error and de novo review is allowed under 2254D2 because, as the Supreme Court indicates, that they looked at some of these additions that we believe should have been in regarding the PET scan, the medical records, Dr. Cunningham, those things are in the record before this court, were cumulative in nature. That is simply not true. And for those two reasons, under 2254D1 and 2, we believe de novo review I have a kind of a commonsensical question, which is, you talk about a lot of your argument is about cumulative. Does that require that you, that the court find two or more of your issues were ineffective assistance of counsel? No, I think the cumulative Otherwise, how do you look at cumulative? If the Missouri Supreme Court and the District Court are right, they were not ineffective assistance of counsel, what are we accumulating? Well, what we're talking about is they said that the evidence that we were, that at the 2915 hearings that were discussed and when they ruled, they said that that was cumulative in nature as to the original capital penalty phase litigation. And therefore, since it was cumulative in nature, it didn't provide anything in addition for the jury to consider when rendering its verdict. But when you're, and so that's what I meant. So we were on the wrong page. I apologize. I think where you're asking, and I can answer that too, I hope, is, is that under Wiggins, under Wiggins, we look at the totality or the cumulative of all the acts within the Wiggins claim and those things that were left out. At the prejudice stage? I think at both stages. Wiggins doesn't say that. Neither does Porter. I don't know of any Supreme Court that says that. I mean, our, we've got 20 years of jurisprudence that the, on the deficient performance problem, you look at the allegations individually. I think when you look at the allegations individually. And then you, when the deficient performances you determine, when you move to the prejudice problem, you look at potential, that the cumulative effect of those deficient performances is, is evaluated. And I don't think we've got a case that says, is to the contrary of that. Well, I, the position is, is, I mean, as you can argue to the contrary, but don't, don't, don't say that Wiggins establishes something different than what I just said. Well, I think when you look at Porter and when you look at Ramballa, both of those talk about multiple, you know, and Strickland talks about errors. And then Wiggins talks about errors. Porter was strictly a prejudice evaluator. That's all that was involved. I, I think Ramballa and I think that Porter both stand for the proposition that there was mitigation evidence presented in both of those trial cases. There was several pieces of mitigation evidence in both of those cases that weren't, that were left out. And as a result of that, both those, the Supreme Court in both incidents reversed and sent it back because of the cumulative effect and the, and also, yes, Judge Loken, you're correct. We also believe that it's cumulative and prejudicial to Mr. Forrest in this case as well. Well, except they found no deficient performance. I mean, that's the, that's the, and then alternatively, no prejudice. Well, you've got to, you've got to overcome both hurdles in turn vis-a-vis the state court decision. Well, I mean, I, you know, the court, the court below and the Supreme Court both talk about the trial strategy is the reason why. And that simply cannot be the cases that relates to PET scan. I mean, in 2000, May 2003, they talk about needing Dr. Preston, but then they wait almost 18 months before they ordered on the eve of trial. And even the two trial counsels aren't even the one that reach out to Dr. Evans or Dr. Smith in St. Louis about the PET scan. It's a third one. And it looks like when you look at the record and you look at everything below, the left hand and the right hand in the public defender's office, trial counsel, as hard as they work, and having done trial work, I know how this is. But they just simply drop the ball as it relates to getting a PET scan. That's what happened here. I don't know how they can see it otherwise. What is so critical about the PET scan? You know, the government argues in the Missouri Supreme Court and the district court here all say, well, you know, it was kind of equivocal what it was going to be. And the experts, Mr. Forrest's experts all said, well, they wouldn't change their minds anyway. And somebody, you know, I know you're pinning your hopes on that, but what is it about the PET scan that I haven't been convinced that that was something that was right out there that had to be done? Well, when you look at the record, the prosecutor, Mr. Ashton, is for the Attorney General's absolutely crucifies the experts that Mr. Forrest brought forward in the penalty phase about not doing any type of objective type of analysis. Actually has some of our experts have to concede the issue that they did not, did not have that objective testing, that PET scan, MRI, x-ray. Concede? I mean, that was a fact. Why wouldn't they, why wouldn't they admit that? Well, they would have to admit it. They're being truthful. I'm not saying that. There was no concession. It was just cross-examined. Did you do this? No. Did you do that? Yes. Did you do this? Yes. No. The position, Mr. Forrest, would have been, had they done, had trial counsel done the things that they should have done, that those answers from those experts would have been different and there would have been also another expert. To that particular question. As it relates to PET scan. Then they would have said that the PET scan that was done post-conviction supports the opinions we've just gave, we just gave on direct exam, right? Yes, but, I mean. Yes, but, but yes. The answer is yes. I mean, I understand where you're going with, it would have been nice to have additional confirmation, but, but, you know, chief asked why is this critical? Well, I, I think it's very critical because I, as I was saying is that Mr. Ashens makes a big, makes a fairly big production about it in his closing arguments. He makes issues about it and crosses the emanation, the lower. That's what lawyers do. I, I understand, but. Well, if, if it had been there, then we, then there would have been more cross-exam about what, okay, so it confirms your opinion, now let's talk about what exactly it, it shows and what it doesn't show in relation to the mitigating statutory factors, right? We have an additional piece here that I think. Isn't that the way the cross would likely have gone? I can't predict how the cross would have gone. Well, that's what our job is. And then your, your people had already said all kinds of things about putting down the significance of the PET scan. That's what's, you know, I'm wondering why, why is it critical when your own experts, not yours, but Mr. Forrest's experts were saying, well, you know, and then, of course, you have this other factor, which was they were afraid they, they'd have to disclose it to the government. They were afraid that it would come up, you know, inconclusive or negative or something. As it relates to Dr. Gilbert and his 2915 hearing, he, he tell, he tells the, on the And it simply ran out of time. Now, that happened in, I believe, in the middle of September, so roughly two weeks before trial. Was he the one that wanted an MRI first? No, that was the doctor that they ended up not using. That's who they reached out to when they only had two weeks left. Dr. Gilbert went on to say in his 2915 hearing testimony that if he had been asked, he would have told them to go to a different doctor or he might have even actually ordered the PET scan himself. Well, what was unreasonable for the public defender to say, you know, under Missouri law, I'm going to have to disclose this no matter what the result is and the, you know, the result might be harmful to Mr. Forrest or neutral to Mr. Forrest. And I don't want to run that risk. Well, first, first of all, they didn't endorse the wit, they would have had to endorse the witness to turn it over. So if they would have done a test, and, and we talk about that in our original briefing, that if, and the Missouri case law is pretty clear on that. I mean, if you don't endorse the witness, you don't have to turn over the documents. I thought the transportation would have required some disclosure. Did I, I thought I read that in the briefs. They, they would have had to disclose, I mean, I guess it would depend upon the extent of the motion or what the trial. The knowledge of testing was done. That the knowledge of testing was done, but that, you know, it's also, I think it's fair to represent to this court that, you know, the state never presented any expert testimony, even though that they knew that this issue was out here. They'd seen, they knew that he had endorsed certain witnesses that related to mental health issues in the penalty phase and in the trial. I don't understand the relevance of that. Well, the relevance is, is that they were aware of that. And so even if you had to file a motion with the trial court. They were aware of what? That Mr. Forrest was going to be relying on some sort of mental health defense, both in the guilt phase and the penalty phase by the way that they had put their case together and the witnesses that they endorsed. So if they had filed a motion asking for transportation for a PET scan, that would have been, would not have been a revelation to the, to the state prosecutor. They were already aware that this was going on. Yet the state never asked for any testing. They never retained an expert. Well, but that allowed, that allowed the defenders to own the issue. I mean, they had their own experts, uncontroverted by the government. I mean, the government obviously cross-examined them. But I mean, they, without the government having experts to contradict what the defendants owned, it seems to me that that diminishes the value of the PET scan or even some of the medical records in Dr. Cunningham in that this whole issue was set up with three experts that the defendant had uncontroverted by the government, other than cross-exam. Right. I think that some, some of the experts, I mean, Dr. Gilbert was kind of testifying with him, this is my words, with one hand tied behind his back. He had previously, you know, he wanted the PET scan and wasn't able to get it. The issue is when we look at like Romballa and Porter is, is that, you know, you have to do a complete investigation here. And they just simply dropped the ball as it relates to the PET scan. When you look at the medical records, the trial counsel says that it wasn't mitigation friendly. If you, you've seen the records, the record, there's nothing adverse in there. It talks about that he, it objectively sustains the issue that he received a head injury from a baseball bat. That was something that, again, Mr. Ashens in cross-examination said, well, that was kind of a self-serving statement that you got from Mr. Forrest when you interviewed him. Isn't that correct? Yes. Do you have any objective? No, I don't. And so those, I mean, those, it's that type of things that we needed, that Mr. Forrest needed in order to have his jury in the penalty phase have all the evidence. And they didn't have all the evidence. And they could have, but for trial counsel's failure to properly investigate. Do you have any case law from the Supreme Court or our court says that they have to have complete and all the evidence? I mean, it seems to be the case law is you don't have to turn over every stone. You have to have a reasonable investigation and a reasonable case. In fact, we've held that you don't, and I think it was in the death case. There's no Sixth Amendment obligation to seek out cumulative expert. If you've got one expert, and the post-conviction claim is, well, two or three more, or one or two more would have reinforced the mitigation testimony. We've held that's not ineffective, haven't we? Your Honor, I don't believe that, the proposition that you're forwarding is, is that the PET scan. No, I'm saying haven't we held that? In the terms of multiple live experts. Here we have a PET scan who was cumulative to a live expert. If the second live expert is not, there's no constitutional obligation to seek out a second live expert. Why is there a constitutional obligation to seek out some scientific testing corroboration? I mean, I think both case law or other, I mean, you know, I don't think, isn't that a relevant analogy? Your Honor, I disagree. I mean, it would be- With what part of it? That we haven't, I can't remember the name of the case, but I was on a panel that dealt with the issue of whether it was ineffective assistance, not to get a cumulative mitigation expert, and we held no. Well, and I don't believe that the issue has been, I don't believe Mr. Forrest believes it's cumulative. I know that you see otherwise, Your Honor, but the cases of Rombralla and Porter talk about additional investigation. This would be no different than having a testimony of an eyewitness and then you have a testimony of someone who took a confession from a witness or from the defendant. And then it being cumulative to enter in that written confession into the evidence. That's what happened here. You have an expert who talked about doing forensic testing, but we have some objective testing in the PET scan. We have additional information in the medical records to support that. And my time is almost up here, but as it relates to Dr. Cunningham, I would like to touch briefly upon that. Dr. Cunningham would have gone to future dangerousness. At the end of the day, I believe that if all of the evidence that came up in the 2915, the PET scan, the medical records, and Dr. Cunningham had been introduced into the record in the trial phase, that at least two statutory mitigating factors would have been met. It would have almost been airtight. And that would have been something that would have weighed very heavily in favor of Mr. Forrest, and I believe would have resulted in a different decision. When we look at the state talks about in their briefing that this was powerful aggravating. The guilt phase might have been powerful evidence. I think that the penalty phase was a little bit not powerful. It simply wasn't powerful. They only have the curinary gain as it related to two of the homicides. They had a multiple homicide, and then we had the death of Trooper Barnes. Let me ask it again, kind of a general, more of my common sense questions. We see some of these death penalty cases, and you may see a lot more in your research. But to have 12 lay witnesses and three experts, that's about as many as I've seen. So I'd like just your general view about, you're challenging the defenders. You're saying right now that it wasn't, on the mitigation side, they didn't do as good a job. But I'm just saying in general, I don't know if I've seen such a numerically good case here. When you're looking at penalty phase and you're looking at weighing whether or not someone's sentenced to death or life in a case like that, I don't think it's fair to just add up the numbers in one column and say, therefore, they had adequate representation or an adequate penalty phase defense. Your Honor, at the end of the day, what we have here is we have trial counsel who early on, in May 2003, acknowledged certain witnesses, including Dr. Preston, needed to be retained and discussed and examined, Mr. Forrest, for brain damage. That simply was not done. Not done until 18 months later on the eve of trial, two weeks before trial is when they try to do it. And when they're given a roadblock of an MRI, they abandon it at that point. I mean, that's what we have here. And then when it comes to medical records, there is no reason that those medical records couldn't gone in to the penalty phase adjudication and consideration. And Dr. Cunningham, again, there's no reason why that couldn't have been called. They talk about, in the post conviction, they talk about the fact that there was the homicide to be concerned about, or the murder investigation out of California that Mr. Forrest might have been involved in. But when Mr. Cunningham or Dr. Cunningham looks at future dangerous, he would testify, and he talks about it in the record, that he doesn't look at those type of factors when assessing it. He looks at the age of the defendant, what the current offense was, and how he is done in confinement. And all of those scored well, as Dr. Cunningham testified to, and he would have been able to testify in a guilt phase that he would not be a future danger if given life in prison. For all of the reasons that we've discussed over the last 20 minutes, we would ask that you reverse this back to the trial court. Thank you. Okay. Thank you, Mr. Sandage. I guess we're going to Mr. Hawk. Am I correct on that? Mr. Gibson, you're going to do rebuttal. I'm going to do rebuttal. Okay. Thank you. May we proceed? Good morning. May it please the court, the respondent would respectfully request that the judgment of the United States District Court for the Western District of Missouri be affirmed. The constitutional issue before the court is a Sixth Amendment claim that the offender received ineffective assistance of trial counsel at the penalty phase. The thing that was not mentioned by the petitioner this morning is the fact that this is a petition for writ of habeas corpus brought before the federal court under 2254A. Congress requires federal courts, when reviewing the state court's determination of the merit of a constitutional claim, to give the state court's decision deference unless it is contrary to or involves an unreasonable application of federal constitutional law. Well, that's true, and there's certainly a Supreme Court constitutional law, but we look, review these habeas cases looking at the totality of the circumstances. And I think that's what the petitioners here are saying is when they talk about cumulative, is that the Missouri Supreme Court and Motions Court did not look at the totality of the circumstances, how everything that they're complaining about may have affected the trial and was inadequate or ineffective assistance of counsel. What's your response to that? The response is several fold. First, in terms of ineffective assistance of trial counsel, the petitioner has two burdens under Strickland versus Washington. The petitioner has to demonstrate a breach of duty by trial counsel, a breach of a constitutional duty by trial counsel, and the petitioner has to demonstrate Strickland prejudice. Strickland defines that prejudice as whether or not the claim breach of duty creates a reasonable probability that the outcome of the trial would have been different. Strickland speaks in terms of the breach of duty prong as looking at the attorney's decision as the attorney was looking at the decision. Phrased another way, you do not use hindsight to examine the attorney's decision. You examine the reasonableness of the decision in light of the information in front of the trial counsel. So when you talk about totality of the circumstances, I think Strickland circumscribes that phrase a little bit because you look at the attorney's decision in light of what the attorney knew at the time. Let me just posit this, probably terrible analogy, but you could look at something that the liar did something that maybe wasn't, there was a better way to do it, but it's not ineffective. And then they did something else that wasn't ineffective, but was maybe a better way to do it. And you can build on and build on until you say, well, none of those individually were ineffective assistance of counsel. But when you add them all up, look at the totality of the circumstances, and that's what I think they're saying here, is you look at all of those, that's ineffective assistance of counsel. First of all, is that the law? And number two, how does it apply to this case? Rephrasing your question, I think what you're asking is whether or not there is accumulation of prejudice in determining whether or not there is a reasonable probability that the outcome of the trial would have been different. I believe the answer from this court is no. You do not accumulate a bit of prejudice here, a bit of prejudice there, a bit of prejudice from the fourth claim of ineffective assistance of counsel. And you don't conglomerate that into a totality of prejudice and make the announcement that there is a reasonable probability that the outcome of the trial would have been different. The Eighth Circuit case that comes to mind on that topic is called Gertman versus Lockhart. It's about 20 years, decided about 20 years ago by this court. In terms of just general constitutional claims and whether you aggregate constitutional claims together to make a finding of cumulative prejudice. Again, the answer there is no. The first case that held that is Bird versus Armantrout about 25 years ago. But that is in the context of accumulating various constitutional claims to make a finding of prejudice. Well, don't you have to modify that a little bit by your standard of what counsel saw at the time? So if counsel said, well, I could have this kind of expert, but I don't think I want that one. I could have this kind, and I could have this one. The end result is when counsel says, I'm not going to have the third or fourth different kind, is there's no expert. You look at counsel's decision on the fourth evaluation, right? Yes. So that at the time, there is a cumulative effect, if you will, of the other things counsel's decided not to do that plays into the constitutional reasonableness of what was done. Yes. But again, it's at the perspective of, it's at counsel's perspective at the time. Isn't that implicit in our prior cases? I believe that it is. The determination of whether there is a breach of duty is done from the perspective of counsel at the time the decision is made. In terms of prejudice, sometimes it really depends on how the claim is phrased. If the offender is claiming, I received ineffective assistance of counsel because counsel did not object to a piece of evidence. And I received ineffective assistance of counsel because counsel didn't object to the prosecutor's closing argument. And then the third claim is, I received ineffective assistance of counsel because counsel did not notice up an alibi defense. And then the fourth claim is, I received ineffective assistance of counsel because counsel didn't call the expert. Those are, an expert on mental health. Those are discrete allegations of ineffective assistance of counsel. And one of the things that you'll notice when you're reading, not just Strickland, but all the cases from the Supreme Court on the topic of ineffective assistance, is that the prejudice standard is whether there is a reasonable probability that the outcome of the trial would have been different. And the reason why I emphasize that is that that analysis is not measured by pounds, it's not measured by quarts, it's not measured by some measuring device that a scientist would use. Instead, it calls upon a judicial determination of whether the court's confidence in the outcome of the verdict is undermined. It's a judicial determination. And the reason why you do not congregate those discrete claims of ineffective assistance of counsel is because they don't really, they don't really add up into a way of analyzing that under the Strickland standard. If the counsel is ineffective because he did not call or notice of an alibi defense, that's either a yes, no type of determination. Court's confidence is either undermined by that or it is not. You don't get to being, well, 25% undermined by that and 40% undermined by the mental health expert. And then add all that up together to become a finding of a reasonable probability that the outcome of the trial would have been different. Allegations of ineffective assistance of counsel are discrete. They take a variety of different forms. Yeah, but let's, if we're talking prejudice now, I guess my question would be, suppose, hypothetically, that it was not deficient performance, not to call the additional lay witnesses that is argued by petitioner, but it was not to investigate and present the PET scan. In measuring Strickland prejudice, would we then properly consider the absence of the lay witnesses or not? I don't believe that you would. I don't think so either, but I'm not sure what cases address that. No, I don't believe that you would be. It's hard when the Supreme Court says you look at the totality of circumstances, and there's no question. The totality of circumstances is, you look at everything, which is, why didn't you call more lay witnesses, or why didn't you call Dr. Cunningham? I'm just struggling here, what does that mean? I think it may be fair to say that there are certain types of claims that you look at the different types of witnesses. Let's just hypothetically say the claim is ineffective assistance of trial counsel at the penalty phase because- We'll use the issues here, that's what we're talking about. The PET scan, the medical records, Dr. Cunningham, and the lay witnesses. I mean, might as well talk about what's pertinent. Those are discrete issues, and I don't believe that those congregate together. Now, if you're looking at just the last claim, where it's ineffective assistance of counsel for not calling the three witnesses, the three penalty phase witnesses, as mitigation. I think you can probably look at those as a conglomerate, because the claim isn't really, I received ineffective assistance of counsel because counsel didn't call witness X. The claim is, I received ineffective assistance of counsel because counsel didn't call lay mitigation witnesses. So I think those three together, those three witnesses could be looked at as a totality in analyzing that one claim. But I don't think you mix Cunningham, you know, the Cunningham claim with the three witness claim with the PET scan claim. Those do not mix together in- Not everything you say is logical. I mean, I could argue, counsel argues logically the other way. But is there any case law that, particularly by the Supreme Court or by our court, that goes through this analysis? The case law that I'm thinking of would be Gertman, that says you do not lump discrete claims of ineffective assistance of counsel together to make a determination of cumulative prejudice with your ineffective assistance of counsel claim. Now, there are Supreme Court cases since Gertman that the petitioner cites, like Ronpella. But those examples, I think, really look, are consistent with what I am contending. And that is, you look at the discrete claims of ineffective assistance of counsel, the penalty phase, that it's okay to lump together the three mitigation witnesses and determine whether there's ineffective assistance of counsel for not calling the three mitigation witnesses. I think it's okay. Let's just assume that there was a second, well, no, this actually works with our case. The claim with the PET scan, you know, you'll have the claim that Dr. Preston's report was not presented, that Dr. Preston's report was not submitted in the evidence. Those things have a certain commonality there, that all of that could be considered together in determining whether it was ineffective assistance of counsel for not introducing PET scan evidence. So things that have a commonality like that, I think, are fairly considered together under Ronpella, Wiggins, and the like. Let's go to the individual claims, kind of beating this to death, unless you have something you want to add on the totality of the circumstances part. No. Okay. Well, let's go to the individual claims. Okay. The one thing that I heard that the petitioner say this morning that also is deserving of some comment is that the petitioner made the argument that there is a constitutional duty to do a complete investigation. That is an okay statement, but it doesn't say the entire standard from the United States Supreme Court. When you look at Strickland, and when you look at Ronpella, and when you look at Wiggins, and when you look at Pullen, when you look at all the cases, the Supreme Court does not say that there is a constitutional duty to investigate and investigate and investigate and investigate and investigate with more investigations after that repetitive sentence. Instead, what the standard is, is that there is a constitutional duty to investigate and make a reasonable decision not to investigate any further. And that was the second part of that sentence that I just articulated there is not what I heard the petitioner say this morning, but it is in the Supreme Court cases. And you can see that applied by this court in the cases that Judge Loken was talking about this morning. There was a, and that was in the context of whether there was ineffective assistance of counsel for not obtaining a second expert. Those cases are usually in the context of a mental health expert at the penalty phase. Generally speaking, those cases have the fact pattern of counsel obtained an expert opinion and it wasn't favorable to the defendant, so the defendant didn't use that first expert at the penalty phase. So the claim as it rolls into federal court becomes, well, counsel was ineffective because they didn't get a second expert. And of course, it could go to third or fourth or whatever the next number might be. And this court in resolving those cases has applied that maxim, that statement of law from the Supreme Court that says that there is a reason, that there is a duty on counsel to make a reasonable investigation and to make a reasonable decision not to investigate further. So in those cases where counsel does not get the second, third, fourth expert, those attorneys have made reasonable decisions not to obtain that second, third, or fourth expert. And that's usually in the context, and the analysis there goes to whether or not there is something that counsel knew that would have created a duty in that counsel to obtain the second expert. And I use that to illustrate the principle that there must be something that it is okay for counsel not to investigate when there is a, when counsel makes a reasonable decision not to investigate further. Now, as to the particular claim with the PET report, with the PET scan report, counsel knew that it was possible to obtain a PET evaluation, a PET scan of the petitioner. Counsel was familiar that such evaluations could be beneficial. Counsel was familiar that a PET evaluation may confirm that the offender does not have brain damage. So given that information that counsel knew, it was reasonable for counsel to take the information that counsel had, the three people, the three experts that could speak about the petitioner's mental health, and to convey that information to the jury. And counsel could make the reasonable determination not to risk that information and make the determination not to obtain the objective information that would refute the testimony of the three experts. So that was the decision that counsel was faced with, and counsel could make that determination not to obtain information that could lead to the prosecutor refuting the testimony of her, of the expert. Did the, did defense counsel have Dr. Preston's 2006 report where he said the PET scan cannot demonstrate, this is paraphrasing, cannot demonstrate diminished capacity, predict future behavior, or determine state of mind? The answer to that. Or that's part of their thought process, or no, does that come later? That comes later in the litigation. The petitioner was already convicted and the Preston report was generated during the state PCR proceedings. That being said, trial counsel testified during the PCR proceeding that they were familiar with PET scans and were familiar with what they could and could not show. That you also see that type of information when trial counsel is talking about MRIs. That MRI, that an MRI could show the structure of the brain. PET scans show functioning of the brain by the burning of glucose. MRIs show the structure of the brain, whether or not there is something missing, malformed, a tumor, a vein, a venous disorder, that, you know, MRIs can show lots of things. But if MRIs do not necessarily show brain damage, so trial counsel made a reasoned determination there not to proceed with an MRI because, as counsel said, those are less subject to interpretation. Those are more objective and they tend to be less favorable to the defendant. So at the PCR proceeding, counsels testify about their knowledge of these tests and what they can and cannot show. And I believe that those counsels made a reasoned decision not to proceed with obtaining the PET scan. Concerning mental health records, there are two records in dispute here. One record shows a hospital visit where the petitioner had reported that he had been hit in the head with a baseball bat. The records show that there was a laceration, eight centimeters, that was stitched up. Those records do not show organic brain damage. It only shows the cut that was cleaned up. So that record does not objectively demonstrate organic brain damage at that time. And that record, those hospital records, lead to the question of, well, how did you get hit in the head with a baseball bat? And the significance of that was that counsel did not want the cause of the baseball bat episode before the jury. Because the cause of that baseball bat episode had two negative features to it. One negative feature was that it was an episode of violence that the petitioner, that Forrest, began against the other person. And the episode of violence was related to a drug sale. So there were two negative aspects of that information. Counsel wanted information about drug usage, but did not want a petitioner portrayed as a drug salesperson. And the baseball bat incident was related to the drug sale. It's also an episode of violence initiated by Forrest. So there are two good reasons not to have that before the jury. And it was reasonable for counsel not to introduce pieces of paper that would suggest that. The also of significance there is that the data was actually submitted to the doctors for their review. Concerning Dr. Cunningham, Dr. Cunningham did not take into consideration, with his opinion, the fact that the petitioner was involved in a homicide in California. The petitioner, again, did not want that information brought to the jury's attention and succeeded in a motion in limine before trial in keeping that information away from the jury. So trial counsel did not want to do anything that would open the door to bring in the information about the California homicide. So trial counsel testified at the PCR hearing that they were familiar with Dr. Cunningham and with the type of information that Dr. Cunningham could present to the jury. So trial counsel, again, made a reasoned decision not to introduce information that would be detrimental to the client. Notice how all these decisions by counsel are based upon the information that counsel had before trial, not based on information that was generated after trial and during the PCR proceeding. As to the three mitigation witnesses that are proffered by the petitioner, the petitioner's trial at his penalty phase, not only was there the expert, the three, the testimonies of the three experts, but there was testimony of three family members. That's not fair. Some of them were family, some of the other people were family members. Some of them were not family members. The petitioner argues that the benefit of the three people he proposes in the PCR proceeding is that they're not family members. But when you look at the penalty phase testimony of the people that petitioner called, three of them at the penalty phase were also not family members. Craig Holm was a friend from California, Sharp was a friend, and Nancy Young was the goddaughter of the petitioner. So there's not always family relationships at the penalty phase. The marginal advantage that petitioner claims that the three people, Smock, Jacobs, and Fuller, would present is ephemeral and does not exist. I'm open for any further questions. Otherwise, the respondent would pray that the court firm the judgment of the district court. I might just tell you this. I'll probably regret saying this later, but I think it was the execution of Nicholson that the state of Missouri executed somebody, which they probably had the right to do, right in the middle of our petition for rehearing voting. And I just want you to take back the word that some of the members of the court did not appreciate that, that we were right in the middle of voting on that. I understand. Okay. I think you probably have heard that. Some people have written on it. But we were moving as fast as we can. And as chief judge, I was pushing to get everything done in time. But I think you need to be a little more patient. I understand. Thank you. Thank you. Mr. Gibson. May it please the court. I think what the two previous counsels got bogged down in with some of the legal standards really ignores what I think is the crux of this case, which is because a PET scan and the medical records weren't introduced, the prosecution was able to convince the jury that petitioner was not brain damaged, which was false. Everyone would agree now it's false. We have irrefutable scientific evidence that if you look at the pictures of his brain and Dr. Preston's report, Mr. Forrest had severe frontal lobe damage that's three standard deviations below the mean of the average population. Due to the fact that he was 50 years old at the time this happened, he'd been a chronic substance abuser, alcoholic, and suffered a baseball bat assault that's in the medical records. And I think that ties in with what really the promise of Strickland is, is that where counsel did not perform competently, did that undermine confidence in the outcome. And I think the Strickland prejudice standard is borrowed from the Brady and Perjure and Testimony line of cases, which talks about how the confidence in a verdict is undermined when a jury bases its verdict on incomplete or false evidence. And we look no further than the fact right after the verdict was issued, the foreman of the jury told the press, we didn't buy their arguments that Mr. Forrest was brain damaged. So this is what undermines confidence in the outcome. And I think the key to... Is that admissible in the habeas? It came in without objection. It was introduced as an exhibit at the 2915. The state did not object to it. It's in the record. It's in the 2915 record. And it is what it is. And I think if you look at what Mr. Austin's did to their experts, he crucified particularly Dr. Smith, who was one of the trial experts, Dr. Robert Smith. Can you point me to any test, record, brain scan, MRI, anything to prove that he was brain damaged? No. But I think going back over this, and it's in the reply brief, I think the most striking thing that shows the trial counsel was ineffective and it was Dr. Gelbort during the direct examination. Trial counsel, I don't understand why, asked him would a PET scan have confirmed your findings based just on the written tests and your evaluations? He said yes. But then it all came out that one wasn't done. So any sort of suggestion that the trial counsel didn't think that would be important is belied by that. But I think if you just look at the timeline of this case, in May of 2003 they identified Dr. Preston, Dr. Ken Smith, and Dr. Gelbort as necessary witnesses. They believed Mr. Forrest was brain damaged. Mr. Kenyon, co-counsel, said in the memo at page 33 of the addendum, I will contact all three of them. He didn't do it. And then two weeks before trial in September of 2004, Bevy Bendeck, who's another capital defender who wasn't involved in this case, called Dr. Ken Smith, who's the nuclear medicine guy at St. Louis U, and by then it's too late. They ran out of time. There's no explanation for why they didn't do that for an 18-month period. What do you mean by too late? It was too late to get the MRI done, at least through St. Louis U, or not the MRI, but the PET scan done through St. Louis University Hospital. And that shows one of the defects of the state Supreme Court opinions is this quote here. They said, Trial counsel decided weeks before trial commenced not to pursue a PET scan, despite considering it earlier. That's a classic unreasonable determination of fact. It can't be distinguished in any manner whatsoever from the Simmons case. Wait, wait, wait, wait. You mean that saying two, just using the word weeks to describe what in fact was two weeks? I think they said decided before trial commenced not to pursue a PET, despite considering it earlier. That shows that. But I thought you said you implied that they lied when they said weeks. That is the Supreme Court of Missouri. No, I didn't suggest anybody lied. I'm just saying they got the facts wrong, because it's not supported by the record. Okay, so you're not focusing on the word. What did they get wrong? That they didn't. You're saying the exact same thing today, that they knew about it way before and then decided weeks, admittedly two weeks, according to you, before trial not to do it. Where's the unreasonable? The unreasonableness is the fact that there was an 18-month lapse where they never contacted anybody about doing it. Why is that inconsistent with what the Supreme Court of Missouri wrote? They never abandoned it until it appeared that it was too late. They just ran out of time. And that's showed by the question to miss it. And the witness that establishes it couldn't have been done as late as they came around? That's another interesting point, because Dr. Gelbort said that he could have ordered it done at several hospitals. They didn't ask him to do it. No, no, my understanding, and I haven't studied the record, my understanding is they could have done it and decided not to. Not that they waited so long to get around to it that it became impossible to do it. It would have been difficult. Who do I read in the 2915 record to get myself corrected? Well, you can read Dr. Gelbort's testimony. You can read Dr. Preston's testimony. So he's going to say that it was impossible two weeks before trial. It was impossible to do it at St. Louis U Medical Center because Dr. Smith. So what? That's the whole point. They should have called another doctor. That's what Dr. Gelbort said in his 2915. But was it impossible to do it anywhere? No, but that's the whole point. They could have done it then if they would have been confident. But my understanding was they said they didn't do it not because they didn't have time to get it done. They made a decision. I don't know if you'd call it a tactical, strategic decision not to do it based on their knowledge of the PET scans and so forth and about potential of disclosing and so forth. What in the record? Where do we go? I assume from the public defenders that were defending Mr. Forrest. Where do we go to find out that they made the decision because it was too late? I think it's clear from Ms. Turlington made a request on September 15th for funding that got approved. The hurdle was that they couldn't do it through St. Louis U because Dr. Ken Smith insisted on doing an MRI first, and they couldn't do both of them in that short period of time. Is this the transportation problem? No, but I do have something to say about it. I don't understand. You're saying it's impossible. I thought from the briefs that this wasn't an impossibility. It was impossible logistically, I think, for them to do it through St. Louis U with Dr. Smith. They could have done it another way. Okay, but then they chose tactically, strategically, whatever not to. There was no tactical decision. They wanted it done. They just couldn't get it done because they waited too long. Who says that? It's in their text. Ms. Turlington says that. But she did express concern about this Anderson case where they talk about that case. They said that in his case he didn't have a right to an ex parte order to be transported to a mental health facility for a mental exam. But there's nothing in that case that deals with disclosing anything. And I cited in the reply brief State Ex Rel. Richardson v. Randall, a Supreme Court of Missouri case, that held that under the Missouri Discovery Rule, Rule 25, there's no duty to disclose an expert that you've consulted with unless you call him and endorse him as a witness. So that, any strategic. Ms. Turlington says that she was, quote, 100% sure that if defense counsel could have done a PET scan ex parte and had the order filed under seal, defense counsel would have done the scan 100% for sure. That's not to say we can't get it done. That's to say we made a decision based on Missouri law that they didn't want it. Well, that's the point. Under Missouri law, there's no way that an adverse, which it wouldn't have happened, but if there was an adverse test, they wouldn't have had to disclose it. Because any time, if you consult an expert and he doesn't help you, you just don't call him as a witness, the state doesn't get access to it. That's what Randall says. Actually, the prosecution filed a writ of mandamus. Wait a minute. They were going to call the expert. Which expert? The ones they called. That's right. So if they had gotten the test results, they'd have had to hide them from the experts or it would have come out that the experts knew about the negative test results on Cross, right? I don't think any of the other experts would have been in the loop on that. But that's if, oh, now we're going to have counsel getting PET scans, looking at the results, and not telling the experts who would help them evaluate the results? That would have never happened. The evidence was overwhelming that he was brain damaged. Dr. Evans recommended a PET scan in May of 2004. The evidence wasn't. How could the experts get crucified if the evidence was overwhelming? The evidence was not overwhelming because they didn't get a PET scan, because they were attacked. But you're saying this couldn't have had negative results because it was obvious to anybody with a pea brain that the results would have been positive. Well, based on somebody who abuses methamphetamine, cocaine, and alcohol to the extent he did, plus his closed head injury for 30 years, plus Dr. Gelbort, Dr. Evans, they were absolutely positive the PET scan would help. And that's clear from the record. And the fact of the matter is here that the trial counsel knew. They knew based upon Mr. Austin's track record that he was going to attack their findings because Dr. Gelbort, all he did was see him for one visit and then do some written tests. But I think the neuroimaging evidence is really powerful and persuasive evidence. And I think when you look at that, coupled with the other prejudice here, in the Middleton case, which Judge Riley authored, I think Judge Smith below misinterpreted that. Wiggins, Williams v. Taylor, clearly established laws say that you have to consider all of the mitigating evidence, the stuff that wasn't presented at trial, both mental health and otherwise, plus the evidence that was presented at trial in assessing prejudice. And if you look at the Supreme Court of Missouri's opinion, they compartmentalize every aspect of this Wiggins claim and do not consider everything together. And I think under that, you have to review this whole issue de novo and make your own independent determination. Were there other facilities in St. Louis for a PET scan other than at St. Louis University? Dr. Preston ordered the PET scan at Columbia, the Columbia Regional Hospital was where it was done. And if you look at the record, he was retained the 1st of August. They did the PET scan August 3rd. He wrote his report August 20th. It took three weeks from the time he was called. I'm sure he could have done it quicker if he would have had to, which demonstrates my point that when they hit the roadblock with St. Louis U, they would have called Dr. Gelbort or Dr. Preston and got this done. Could they have also done it at Washington University? I suspect they probably could. Aren't there clinics out there where they could do it? Sure. I know that just from my own experience, because my wife has a neck problem, is they have all these neuroimaging places that aren't even affiliated with hospitals anymore. I assume that was in the case 10 years ago, but I'm sure that could have been done. But the real deficient performance, which is indefensible under Wiggins, is why, when they knew in May of 2003 that they needed to do this, did they do nothing for 18 months? That's no different than Wiggins, and that's subjectively unreasonable performance. One last thing I want to say on the cumulative. Your time's up, so make it fast. It'll be real fast. On the cumulativeness thing, that's an unreasonable determination of fact, because something can't be cumulative on a contested issue. In these death penalty cases, usually where we see that is where the prosecution doesn't contest good character evidence or bad childhood evidence or successive competence evaluations. When you have something that's a contested issue, it cannot be cumulative. The Missouri Supreme Court's Black decision says that. The Cooper decision says that from the 11th Circuit. So I think you can look at this and see there are enough flaws in this decision that you can independently review the case and grant relief. Thank you. Thank you. Well, we will take it under advisement. We thank you for your arguments, and we'll be back to you in due course.